**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 25-CR-20476-JB**

**UNITED STATES OF AMERICA**

v.

**COMUNICACIONES CELULARES S.A.,**
**d/b/a TIGO GUATEMALA,**

**Defendant.**

_____/

## DEFERRED PROSECUTION AGREEMENT

Defendant Comunicaciones Celulares S.A., d/b/a TIGO Guatemala (the "Company" or

"TIGO Guatemala"), pursuant to authority granted by the Company's Board of Directors reflected

in Attachment B, and the United States Department of Justice, Criminal Division, Fraud Section

(the "Fraud Section"), and the United States Attorney's Office for the Southern District of Florida

("SDFL") (collectively, the "Offices") enter into this deferred prosecution agreement (the

"Agreement"). Millicom International Cellular SA ("Millicom"), which is not a defendant in this

matter, also agrees, pursuant to the authority granted by Millicom's Board of Directors, to certain

terms and obligations of the Agreement as described below. The terms and conditions of this

Agreement are as follows:

### Criminal Information and Acceptance of Responsibility

1.     The Company acknowledges and agrees that the Offices will file the attached one-

count criminal Information in the United States District Court for the Southern District of Florida

charging the Company with conspiracy to commit an offense against the United States, in violation

1

of Title 18, United States Code, Section 371, that is, to violate the anti-bribery provisions of the Foreign Corrupt Practices Act of 1977 ("FCPA"), as amended, Title 15, United States Code, Sections 78dd-3. In so doing, the Company: (a) knowingly waives any right it may have to indictment on this charge, as well as all rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); (b) knowingly waives any objection with respect to venue to any charges by the United States arising out of the conduct described in the Statement of Facts attached hereto as Attachment A ("Statement of Facts") and consents to the filing of the Information, as provided under the terms of this Agreement, in the United States District Court for the Southern District of Florida; and (c) agrees that the charges in the Information and any charges arising from the conduct described in the Statement of Facts are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement. The Offices agree to defer prosecution of the Company pursuant to the terms and conditions described below.

2. The Company admits, accepts, and acknowledges that it is responsible under United States law for the acts of its officers, directors, employees, and agents as charged in the Information, and as set forth in the Statement of Facts, and that the allegations described in the Information and the facts described in the Statement of Facts are true and accurate. The Company and Millicom agree that, effective as of the date the Company signs this Agreement, in any prosecution that is deferred by this Agreement, the Company and Millicom will not dispute the Statement of Facts set forth in this Agreement, and, in any such prosecution, the Statement of Facts shall be admissible as: (a) substantive evidence offered by the government in its case-in-chief and rebuttal case; (b) impeachment evidence offered by the government on cross-examination; and (c) evidence at any sentencing hearing or other hearing. In addition, in connection therewith, the

2

Company and Millicom agree not to assert any claim under the United States Constitution, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, Section 1B1.1(a) of the United States Sentencing Guidelines, or any other federal rule that the Statement of Facts should be suppressed or is otherwise inadmissible as evidence in any form.

## Term of the Agreement

3.      This Agreement is effective for a period beginning on the date on which the Information is filed and ending two years from that date (the "Term"). The Company and Millicom agree, however, that, in the event the Offices determine, in their sole discretion, that the Company or Millicom has knowingly violated any provision of this Agreement or has failed to completely perform or fulfill each of the Company's or Millicom's obligations under this Agreement, an extension or extensions of the Term may be imposed by the Offices, in their sole discretion, for up to a total additional time period of one year, without prejudice to the Offices' right to proceed as provided in Paragraphs 18 to 22 below. Any extension of the Agreement extends all terms of this Agreement, including the terms of the reporting requirement in Attachment D, for an equivalent period. Conversely, in the event the Offices find, in their sole discretion, that there exists a change in circumstances sufficient to eliminate the need for the reporting requirement in Attachment D, and that the other provisions of this Agreement have been satisfied, the Agreement may be terminated early.

## Relevant Considerations

4.      The Offices enter into this Agreement based on the individual facts and circumstances presented by this case, the Company, and Millicom, including:

        a.      the nature and seriousness of the offense conduct, as described in the Statement of Facts, including a pervasive bribery scheme to obtain and retain telecommunications

business in Guatemala, orchestrated by the Company's Guatemalan shareholder and then-senior Company personnel and involving the use of narcotrafficking proceeds to fund some of the bribes;

      b.     in 2015, Millicom voluntarily and timely disclosed to the Criminal Division misconduct at the Company (Millicom's then-joint venture) that, in part, forms the basis for this Agreement. However, despite Millicom's 55% ownership share, Millicom lacked operational control over the Company. The Company's Guatemalan shareholder used its operational control to prevent Millicom from accessing critical information, and to prevent Millicom from requiring Company personnel to cooperate with the Fraud Section's investigation and take remedial actions. The Fraud Section closed its initial investigation in 2018. Two years later, in 2020, the Offices obtained and proactively developed new evidence from sources other than the Company and Millicom regarding the Company's conduct and reopened their investigation on that basis. During the second phase of the investigation, the Offices obtained new and additional evidence about the scope of the Company's conduct, including that the criminal conduct continued during and after the Offices' closure of the first phase of the investigation and involved narcotrafficking proceeds that were used to generate cash for some of the bribe payments. For those reasons, while the Company received credit for Millicom's self-report pursuant to U.S.S.G. § 8C2.5(g)(1), the Company did not meet the requirements of the Criminal Division's Corporate Enforcement and Voluntary Self-Disclosure Policy, JM § 9-47.120 (CEP), to qualify for either a Part I or Part II resolution. Nonetheless, the Offices gave significant weight to the voluntary disclosure of the misconduct in 2015 in determining the appropriate disposition of this matter—including the form and term of the resolution and the maximum reduction for cooperation and remediation under Part III of the CEP.

c.     the Company received credit for its and Millicom's cooperation with the Offices' investigation pursuant to U.S.S.G. § 8C2.5(g)(1) because it cooperated with the investigation and accepted responsibility for its criminal conduct; the Company also received credit for its and Millicom's cooperation and timely remediation pursuant to the CEP.  The substantial cooperation included, among other things, (i) Millicom self-reporting conduct that forms, in part, the basis for this Agreement; (ii) promptly collecting, analyzing, and organizing voluminous information, including complex financial information; (iii) gathering evidence and performing forensic data collections in the countries covered by the Offices' investigation; (iv) providing information obtained through its internal investigation, particularly during the second phase of the Offices' investigation, which allowed the Offices to preserve and obtain evidence as part of their own independent investigation; (v) facilitating interviews with employees, including making foreign-based employees available for interviews in the United States; (vi) making detailed factual presentations to the Offices; and (vii) proactively disclosing evidence of which the Offices were previously unaware and identifying key documents in materials produced, including translating Spanish-language documents;

d.     the Company and Millicom provided to the Offices all relevant facts known to them, including information about all individuals involved in the conduct described in the Statement of Facts and conduct disclosed to the Offices prior to the Agreement;

e.     the Company also received credit pursuant to the CEP because, following the prior joint venture partner's exit and Millicom's acquisition of full ownership and control of the Company in 2021, the Company and Millicom engaged in extensive timely remedial measures, including: (i) undertaking a root cause analysis of the misconduct at the Company and risk assessment of the Company's operations; (ii) terminating personnel involved in the bribery

5

scheme; (iii) introducing new and experienced management and compliance personnel to change the local operation's culture of compliance; (iv) enhancing third-party onboarding and transaction monitoring, including by centralizing and linking the oversight functions under Millicom, incorporating data analytics and automated continuous monitoring across operations, and periodically testing relevant controls for effectiveness (including testing of more than 250 transactions); (v) developing an ephemeral messaging policy, which employees are required to acknowledge they have read as part of annual training, and incorporating a system to preserve and analyze Company employees' ephemeral messages; (vi) launching an extensive training campaign covering anti-corruption and compliance risks; (vii) quickly incorporating key compliance policies and procedures, and creating a direct reporting line from the Company's compliance function to Millicom; and (viii) over the last ten years, significantly restructuring, expanding, and resourcing Millicom's global compliance program, including enhancing its compliance risk assessment process, growing the dedicated compliance headcount by 800%, and engaging in continuous monitoring, testing, and updating of Millicom's global compliance program;

f.    the Company and Millicom have enhanced and have committed to continuing to enhance the Company's compliance program and internal controls, including ensuring that the Company's compliance program satisfies the minimum elements set forth in Attachment C to this Agreement (Corporate Compliance Program);

g.    based on the Company's and Millicom's remediation and the state of its compliance program, and the Company's and Millicom's agreement to report to the Offices as set forth in Attachment D to this Agreement, the Offices determined that an independent compliance monitor is unnecessary and that the term of the deferred prosecution agreement is two years;

h.    the Company and Millicom have no prior criminal history;

6

i.  the Company has a limited history of prior civil and regulatory actions in Guatemala resulting from dissimilar and unrelated conduct; and

j.  the Company and Millicom have agreed to continue to cooperate with the Offices in any ongoing investigation as described in Paragraph 5 below.

k.  Accordingly, after considering (a) through (j) above, the Offices have determined that the appropriate resolution of the Offices' investigation is a deferred prosecution agreement with the Company with a two-year term; payment by the company in the amount of a $60,000,000 criminal monetary penalty, which reflects a reduction of 50 percent from the bottom of the applicable Guidelines range, and $58,198,343 in forfeiture.

<u>**Ongoing Cooperation and Disclosure Requirements**</u>

5.  The Company and Millicom shall cooperate fully with the Offices in any and all matters relating to the conduct described in this Agreement and the Statement of Facts and other conduct under investigation by the Offices at any time during the Term until the later of the date upon which all investigations and prosecutions arising out of such conduct are concluded, or the end of the Term. At the request of the Offices, the Company and Millicom shall also cooperate fully with other domestic or foreign law enforcement and regulatory authorities and agencies, as well as the Multilateral Development Banks ("MDBs"), in any investigation of the Company, its parent company or its affiliates, or any of its present or former officers, directors, employees, agents, and consultants, or any other party, in any and all matters relating to the conduct described in this Agreement and the Statement of Facts and other conduct under investigation by the Offices or any other component of the Department of Justice at any time during the Term. The Company's and Millicom's cooperation pursuant to this Paragraph is subject to applicable law and regulations, as well as valid claims of attorney-client privilege or attorney work product doctrine; however, the

Company and Millicom must provide to the Offices a log of any information or cooperation that is not provided based on an assertion of law, regulation, or privilege, and the Company and Millicom bear the burden of establishing the validity of any such an assertion. The Company agrees that its cooperation pursuant to this Paragraph shall include, but not be limited to, the following:

        a.      The Company and Millicom represent that they have timely and truthfully disclosed all factual information with respect to its activities, those of their subsidiaries and affiliates, and those of their present and former directors, officers, employees, agents, and consultants relating to the conduct described in this Agreement and the Statement of Facts, as well as any other conduct under investigation by the Offices at any time about which the Company or Millicom have any knowledge. The Company and Millicom further agree that they shall promptly and truthfully disclose all factual information with respect to such activities, those of their affiliates, and those of their present and former directors, officers, employees, agents, and consultants about which the Company and Millicom shall gain any knowledge or about which the Offices may inquire. This obligation of truthful disclosure includes, but is not limited to, the obligation of the Company and Millicom to provide to the Offices, upon request, any document, record or other tangible evidence about which the Offices may inquire of the Company or Millicom including evidence that is responsive to any requests made prior to the execution of this Agreement.

        b.      Upon request of the Offices, the Company and Millicom shall designate knowledgeable employees, agents or attorneys to provide to the Offices the information and materials described in Paragraph 5(a) above on behalf of the Company or Millicom. It is further

understood that the Company and Millicom must at all times provide complete, truthful, and accurate information.

          c.      The Company and Millicom shall use their best efforts to make available for interviews or testimony, as requested by the Offices, present or former officers, directors, employees, agents and consultants of the Company or Millicom. This obligation includes, but is not limited to, sworn testimony before a federal grand jury or in federal trials, as well as interviews with domestic or foreign law enforcement and regulatory authorities. Cooperation under this Paragraph shall include identification of witnesses who, to the knowledge of the Company or Millicom, may have material information regarding the matters under investigation.

          d.      With respect to any information, testimony, documents, records or other tangible evidence provided to the Offices pursuant to this Agreement, the Company and Millicom consent to any and all disclosures, subject to applicable laws and regulations, to other governmental authorities, including United States authorities and those of a foreign government, as well as the MDBs, of such materials as the Offices, in their sole discretion, shall deem appropriate.

       6.      In addition to the obligations in Paragraph 5, during the Term, should the Company and Millicom learn of any evidence or allegation of conduct that may constitute a violation of the FCPA anti-bribery or accounting provisions or the Foreign Extortion Prevention Act ("FEPA") had the conduct occurred within the jurisdiction of the United States, the Company and Millicom shall promptly report such evidence or allegation to the Offices.

**Payment of Monetary Penalty**

7.      The Offices and the Company agree that application of the United States Sentencing Guidelines ("USSG" or "Sentencing Guidelines") to determine the applicable fine range yields the following analysis:

<ul>
<li>a.      The 2024 Sentencing Guidelines are applicable to this matter.</li>
</ul>

<ul>
<li>b.      <u>Offense Level</u>.  Based upon USSG § 2C1.1, the total offense level is 40, calculated as follows:</li>
</ul>

| | |
|---|---|
| § 2C1.1(a)(2)  Base Offense Level | 12 |
| § 2C1.1(b)(1)  Multiple Bribes | +2 |
| § 2C1.1(b)(3)  High Level Official<br>§ 2C1.1(b)(2), 2B1.1(b)(1)(L)<br>Value of benefit received more than $25,000,000 | +4<br><br>+22 |
| **TOTAL** | 40 |

<ul>
<li>c.      <u>Base Fine</u>.  Based upon USSG § 8C2.4(a)(1), the base fine is $150,000,000</li>
</ul>

<ul>
<li>d.      <u>Culpability Score</u>.  Based upon USSG § 8C2.5, the culpability score is 4, calculated as follows:</li>
</ul>

| | |
|---|---|
| § 8C2.5(a)      Base Culpability Score | 5 |
| § 8C2.5(b)(2)(A)(i) the organization had 1,000 or more employees and an individual within high-level personnel of the organization participated in, condoned, or was willfully ignorant of the offense | +4 |
| § 8C2.5(g)(1)  The organization, prior to imminent threat of disclosure or government investigation and within a reasonably prompt time after becoming aware of the offense, reported the offense to appropriate governmental authorities, fully cooperated in the investigation, and clearly demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct | - 5 |
| **TOTAL** | 4 |

Calculation of Fine Range:

| | |
|---|---|
| Base Fine | $150,000,000 |
| Multipliers | 0.8 (min)/ 1.6 (max) |
| Fine Range | $120,000,000 / $240,000,000 |

8.      The Offices and the Company agree, based on the application of the Sentencing Guidelines, that the appropriate criminal penalty is $60,000,000. This reflects a 50 percent discount off the bottom of the Sentencing Guidelines fine range.

9.      The Company agrees to pay a monetary penalty in the amount of $60,000,000 to the United States Treasury no later than ten business days after the Agreement is fully executed. The Company and the Offices agree that this penalty is appropriate given the facts and circumstances of this case, including the Relevant Considerations described in Paragraph 4 of this Agreement. The $60,000,000 penalty is final and shall not be refunded. Furthermore, nothing in this Agreement shall be deemed an agreement by the Offices that $60,000,000 is the maximum penalty that may be imposed in any future prosecution, and the Offices are not precluded from arguing in any future prosecution that the Court should impose a higher fine, although the Offices agree that under those circumstances, they will recommend to the Court that any amount paid under this Agreement should be offset against any fine the Court imposes as part of a future judgment. The Company and Millicom acknowledge that no tax deduction may be sought in connection with the payment of any part of this $60,000,000 penalty. The Company or Millicom shall not seek or accept directly or indirectly reimbursement or indemnification from any source with regard to the penalty or disgorgement amounts that the Company pays pursuant to this Agreement or any other agreement entered into with an enforcement authority or regulator concerning the facts set forth in the Statement of Facts.

11

## Forfeiture

10.     As a result of the Company's conduct, including the conduct set forth in the Statement of Facts, the parties agree the Offices could institute a civil and/or criminal forfeiture action against certain funds held by the Company and that such funds would be forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c). The Company hereby admits that the facts set forth in the Statement of Facts establish that at least $58,198,343, representing the proceeds traceable to the commission of the offense, is forfeitable to the United States (the "Forfeiture Amount"). The Company releases any and all claims it may have to the Forfeiture Amount, agrees that the forfeiture of such funds may be accomplished either administratively or judicially at the Offices' election, and waives the requirements of any applicable laws, rules or regulations governing the forfeiture of assets, including notice of the forfeiture. If the Offices seek to forfeit the Forfeiture Amount judicially or administratively, the Company consents to entry of an order of forfeiture or declaration of forfeiture directed to such funds and waives any defense it may have under Title 18, United States Code, Sections 981-984, including but not limited to notice, statute of limitations, and venue. The Company agrees to sign any additional documents necessary to complete forfeiture of the Forfeiture Amount. The Company also agrees that it shall not file any petitions for remission, restoration, or any other assertion of ownership or request for return relating to the Forfeiture Amount, or any other action or motion seeking to collaterally attach the seizure, restraint, forfeiture, or conveyance of the Forfeiture Amount, nor shall it assist any others in filing any such claims, petitions, actions, or motions. The Company agrees to pay the Forfeiture Amount by wire transfer pursuant to instructions provided by the Offices no later than ten business days after the Agreement is fully executed.

12

11.     Any portion of the Forfeiture Amount that is paid is final and shall not be refunded should the Offices later determine that the Company has breached this Agreement and commence a prosecution against the Company. In the event of a breach of this Agreement and subsequent prosecution, the Offices are not limited to the Forfeiture Amount. The Offices agree that in the event of a subsequent breach and prosecution, they will recommend to the Court that the amounts paid pursuant to this Agreement be offset against whatever forfeiture the Court shall impose as part of its judgment. The Company understands that such a recommendation will not be binding on the Court.

## Conditional Release from Liability

12.     Subject to Paragraphs 18 to 22, the Offices agree, except as provided in this Agreement, that they will not bring any criminal or civil case against the Company, Millicom, or any of their affiliates and subsidiaries, relating to any of the conduct described in the Statement of Facts or the criminal Information filed pursuant to this Agreement. The Offices, however, may use any information related to the conduct described in the Statement of Facts against the Company or Millicom, or any of their subsidiaries and affiliates:  (a) in a prosecution for perjury or obstruction of justice; (b) in a prosecution for making a false statement; (c) in a prosecution or other proceeding relating to any crime of violence; or (d) in a prosecution or other proceeding relating to a violation of any provision of Title 26 of the United States Code.

a.     This Agreement does not provide any protection against prosecution for any future conduct by the Company, Millicom, or any of their subsidiaries or affiliates.

b.     In addition, this Agreement does not provide any protection against prosecution of any individuals, regardless of their affiliation with the Company or Millicom, or any of their subsidiaries or affiliates.

13

**Corporate Compliance Program**

13.     The Company and Millicom represent that they have implemented and will continue to implement a compliance and ethics program at the Company designed to prevent and detect violations of the FCPA and other applicable anti-corruption laws throughout the Company's operations, including those of its affiliates, agents, and joint ventures, and those of its contractors and subcontractors whose responsibilities include interacting with foreign officials or other activities carrying a high risk of corruption, including, but not limited to, the minimum elements set forth in Attachment C. On the date the Term expires, the Company, by its Chief Executive Officer and Chief Compliance Officer, and Millicom, by its Chief Executive Officer and Chief Compliance Officer, will certify to the Offices, in the form of executing the document attached as Attachment F to this Agreement, that the Company has met its compliance obligations pursuant to this Agreement. This certification will be deemed a material statement and representation by the Company to the executive branch of the United States for purposes of Title 18, United States Code, Sections 1001 and 1519, and it will be deemed to have been made in the judicial district in which this Agreement is filed.

14.     In order to address any deficiencies in its internal accounting controls, policies, and procedures, the Company and Millicom represent that they have undertaken, and will continue to undertake in the future, in a manner consistent with all of its obligations under this Agreement, a review of the Company's existing internal accounting controls, policies, and procedures regarding compliance with the FCPA and other applicable anti-corruption laws. Where necessary and appropriate, the Company and Millicom agree to adopt a new compliance program at the Company, or to modify its existing one, including internal controls, compliance policies, and procedures in order to ensure that the Company maintains: (a) an effective system of internal

14

accounting controls designed to ensure the making and keeping of fair and accurate books, records, and accounts; and (b) a rigorous anti-corruption compliance program that incorporates relevant internal accounting controls, as well as policies and procedures designed to effectively detect and deter violations of the FCPA and other applicable anti-corruption laws. The Company's compliance program, including the internal accounting controls system will include, but not be limited to, the minimum elements set forth in Attachment C.

### Corporate Compliance Reporting

15.     The Company and Millicom agree that they will report to the Offices annually during the Term regarding remediation and implementation of the compliance measures described in Attachment C. These reports will be prepared in accordance with Attachment D.

### Deferred Prosecution

16.     In consideration of the undertakings agreed to by the Company and Millicom herein, the Offices agree that any prosecution of the Company for the conduct set forth in the Statement of Facts be and hereby is deferred for the Term. To the extent there is conduct disclosed by the Company that is not set forth in the Statement of Facts, such conduct will not be exempt from further prosecution and is not within the scope of or relevant to this Agreement.

17.     The Offices further agree that if the Company and Millicom fully comply with all of their obligations under this Agreement, the Offices will not continue the criminal prosecution against the Company described in Paragraph 1 and, at the conclusion of the Term, this Agreement shall expire. Within six months after the Agreement's expiration, the Offices shall seek dismissal with prejudice of the criminal Information filed against the Company described in Paragraph 1, and agree not to file charges in the future against the Company based on the conduct described in this Agreement and the Statement of Facts. If, however, the Offices determine during this six-

15

month period that the Company or Millicom breached the Agreement during the Term, as described in Paragraph 18, the Offices' ability to extend the Term, as described in Paragraph 3, or to pursue other remedies, including those described in Paragraphs 18 to 22, remains in full effect.

### Breach of the Agreement

18.     If, during the Term, (a) the Company commits any felony under U.S. federal law; (b) the Company or Millicom provides in connection with this Agreement deliberately false, incomplete, or misleading information, including in connection with its disclosure of information about individual culpability; (c) the Company or Millicom fails to cooperate as set forth in Paragraphs 5 and 6 of this Agreement; (d) the Company or Millicom fails to implement a compliance program as set forth in Paragraphs 13 to 14, of this Agreement and Attachment C; (e) the Company commits any acts that, had they occurred within the jurisdictional reach of the FCPA, would be a violation of the FCPA; or (f) the Company or Millicom otherwise fails to completely perform or fulfill each of the Company or Millicom's obligations under the Agreement, regardless of whether the Offices become aware of such a breach after the Term is complete, the Company or Millicom shall thereafter be subject to prosecution for any federal criminal violation of which the Offices have knowledge, including, but not limited to, the charges in the Information described in Paragraph 1, which may be pursued by the Offices in the U.S. District Court for the Southern District of Florida or any other appropriate venue.  Determination of whether the Company or Millicom has breached the Agreement and whether to pursue prosecution of the Company shall be in the Offices' sole discretion.  Any such prosecution may be premised on information provided by the Company or Millicom or the personnel of any of the foregoing.  Any such prosecution relating to the conduct described in the Statement of Facts or relating to conduct known to the Offices prior to the date on which this Agreement was signed that is not time-barred by the

16

applicable statute of limitations on the date of the signing of this Agreement may be commenced against the Company or Millicom notwithstanding the expiration of the statute of limitations, between the signing of this Agreement and the expiration of the Term plus one year. Thus, by signing this Agreement, the Company and Millicom agree that the statute of limitations with respect to any such prosecution that is not time-barred on the date of the signing of this Agreement shall be tolled for the Term plus one year. In addition, the Company and Millicom agree that the statute of limitations as to any violation of federal law that occurs during the Term will be tolled from the date upon which the violation occurs until the earlier of the date upon which the Offices are made aware of the violation or the duration of the Term plus five years, and that this period shall be excluded from any calculation of time for purposes of the application of the statute of limitations.

19.     In the event the Offices determine that the Company or Millicom has breached this Agreement, the Offices agree to provide the Company and Millicom with written notice of such breach prior to instituting any prosecution resulting from such breach. Within thirty days of receipt of such notice, the Company and Millicom shall have the opportunity to respond to the Offices in writing to explain the nature and circumstances of such breach, as well as the actions the Company and Millicom have taken to address and remediate the situation, which explanation the Offices shall consider in determining whether to pursue prosecution of the Company or Millicom.

20.     In the event that the Offices determine that the Company or Millicom has breached this Agreement: (a) all statements made by or on behalf of the Company or Millicom to the Offices or to the Court, including the Statement of Facts, and any testimony given by the Company or Millicom before a grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or subsequent to this Agreement, and any leads derived from such statements or testimony, shall

17

be admissible in evidence in any and all criminal proceedings brought by the Offices against the Company or Millicom; and (b) the Company and Millicom shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that any such statements or testimony made by or on behalf of the Company or Millicom prior or subsequent to this Agreement, or any leads derived therefrom, should be suppressed or are otherwise inadmissible. The decision whether conduct or statements of any current director, officer or employee, or any person acting on behalf of, or at the direction of, the Company or Millicom will be imputed to the Company or Millicom for the purpose of determining whether the Company or Millicom has violated any provision of this Agreement shall be in the sole discretion of the Offices.

21.     The Company and Millicom acknowledge that the Offices have made no representations, assurances, or promises concerning what sentence may be imposed by the Court if the Company or Millicom breaches this Agreement, and this matter proceeds to judgment. The Company and Millicom further acknowledge that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

22.     On the date that the period of deferred prosecution specified in this Agreement expires, the Company, by its Chief Executive Officer and Chief Financial Officer, and Millicom, by its Chief Executive Officer and Chief Financial Officer, will certify to the Offices in the form of executing the document attached as Attachment E to this Agreement that the Company has met its disclosure obligations pursuant to Paragraph 6 of this Agreement. Each certification will be deemed a material statement and representation by the Company and Millicom to the executive

18

branch of the United States for purposes of 18, United States Code, Sections 1001 and 1519, and it will be deemed to have been made in the judicial district in which this Agreement is filed.

## Sale, Merger, or Other Change in Corporate Form of Company

23.     Except as may otherwise be agreed by the parties in connection with a particular transaction, the Company and Millicom agree that in the event that, during the Term, they undertake any change in corporate form, including if they sell, merge, or transfer business operations that are material to the Company's consolidated operations, or to the operations of any subsidiaries or affiliates of the Company or Millicom involved in the conduct described in the Statement of Facts, as they exist as of the date of this Agreement, whether such sale is structured as a sale, asset sale, merger, transfer, or other change in corporate form, it shall include in any contract for sale, merger, transfer, or other change in corporate form a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement. The purchaser or successor in interest must also agree in writing that the Offices' ability to determine a breach under this Agreement is applicable in full force to that entity. The Company and Millicom agree that the failure to include these provisions in the transaction will make any such transaction null and void. The Company and Millicom shall provide notice to the Offices at least thirty (30) days prior to undertaking any such sale, merger, transfer, or other change in corporate form. The Offices shall notify the Company and Millicom prior to such transaction (or series of transactions) if they have determined that the transaction or transactions will have the effect of circumventing or frustrating the enforcement purposes of this Agreement. If at any time during the Term the Company or Millicom engages in a transaction(s) that has the effect of circumventing or frustrating the enforcement purposes of this Agreement, the Offices may deem it a breach of this Agreement pursuant to Paragraphs 18 to 22 of this Agreement. Nothing herein shall restrict the Company or

19

Millicom from indemnifying (or otherwise holding harmless) the purchaser or successor in interest for penalties or other costs arising from any conduct that may have occurred prior to the date of the transaction, so long as such indemnification does not have the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined by the Offices.

## Public Statements

24.     The Company and Millicom expressly agree that they shall not, through present or future attorneys, officers, directors, employees, agents or any other person authorized to speak for the Company or Millicom make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by the Company set forth above or the facts described in the Statement of Facts. Any such contradictory statement shall, subject to cure rights of the Company and Millicom described below, constitute a breach of this Agreement, and the Company thereafter shall be subject to prosecution as set forth in Paragraphs 18 to 22 of this Agreement. The decision whether any public statement by any such person contradicting a fact contained in the Statement of Facts will be imputed to the Company or Millicom for the purpose of determining whether it has breached this Agreement shall be at the sole discretion of the Offices. If the Offices determine that a public statement by any such person contradicts in whole or in part a statement contained in the Statement of Facts, the Offices shall so notify the Company and Millicom, and the Company and Millicom may avoid a breach of this Agreement by publicly repudiating such statement(s) within five business days after notification. The Company and Millicom shall be permitted to raise defenses and to assert affirmative claims in other proceedings relating to the matters set forth in the Statement of Facts provided that such defenses and claims do not contradict, in whole or in part, a statement contained in the Statement of Facts. This Paragraph does not apply to any statement made by any present or former officer, director, employee, or agent of the Company or

20

Millicom in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of the Company or Millicom.

25. The Company and Millicom agree that if they, or any of their direct or indirect subsidiaries or affiliates issue a press release or hold any press conference in connection with this Agreement, the Company and Millicom shall first consult with the Offices to determine (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the Offices and the Company and Millicom; and (b) whether the Offices have any objection to the release.

26. The Offices agree, if requested to do so, to bring to the attention of law enforcement and regulatory authorities the facts and circumstances relating to the nature of the conduct underlying this Agreement, including the nature and quality of the Company's and Millicom's cooperation and remediation. By agreeing to provide this information to such authorities, the Offices are not agreeing to advocate on behalf of the Company or Millicom, but rather are agreeing to provide facts to be evaluated independently by such authorities.

### Limitations on Binding Effect of Agreement

27. This Agreement is binding on the Company and Millicom and the Offices but specifically does not bind any other component of the Department of Justice, other federal agencies, or any state, local or foreign law enforcement or regulatory agencies, or any other authorities, although the Offices will bring the cooperation of the Company and Millicom, and its compliance with its other obligations under this Agreement to the attention of such agencies and authorities if requested to do so by the Company and Millicom. If the Court refuses to grant exclusion of time under the Speedy Trial Act, 18 U.S.C. § 3161(h)(2), all the provisions of this Agreement shall be deemed null and void, and the Term shall be deemed to have not begun, except

21

that the statute of limitations for any prosecution relating to the conduct described in the Statement of Facts shall be tolled from the date on which this Agreement is signed until the date the Court refuses to grant the exclusion of time plus six months, and except for the provisions contained within Paragraph 2 of this Agreement.

## Notice

28.     Any notice to the Offices under this Agreement shall be given by electronic mail and/or personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed to Chief, FCPA Unit, Fraud Section, Criminal Division, U.S. Department of Justice, 1400 New York Avenue NW, Washington, DC 20005 and Chief, Economic Crimes and Cyber Fraud, U.S. Attorney's Office, Southern District of Florida, 99 N.E. 4th Street, Miami, Florida 33132. Any notice to the Company and Millicom under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, with copies by electronic mail, addressed to Daniel Suleiman, Covington & Burling LLP, One CityCenter, 850 Tenth Street, NW, Washington, DC 20001. Notice shall be effective upon actual receipt by the Offices or the Company and Millicom.

## Complete Agreement

29.     This Agreement, including its attachments, sets forth all the terms of the agreement between the Company and Millicom and the Offices. No amendments, modifications or additions to this Agreement shall be valid unless they are in writing and signed by the Offices, the attorneys for the Company and Millicom and a duly authorized representative of the Company and Millicom.

**AGREED:**

**FOR COMUNICACIONES CELULARES S.A.:**

Date: __11/3/25__                   By: _____
                                         Rafael Alvarado Riedel
                                         Comunicaciones Celulares S.A.


Date: _____                  By: _____
                                         Lanny A. Breuer
                                         Daniel Suleiman
                                         Veronica Yepez
                                         Molly Doggett
                                         Covington and Burling LLP
                                         Counsel for Comunicaciones Celulares S.A.


**FOR MILLICOM INTERNATIONAL CELLULAR SA:**

Date: _____                  By: _____
                                         Salvador Escalon
                                         Millicom International Cellular SA


Date: _____                  By: _____
                                         Lanny A. Breuer
                                         Daniel Suleiman
                                         Veronica Yepez
                                         Molly Doggett
                                         Covington and Burling LLP
                                         Counsel for Millicom International
                                         Cellular SA


**FOR THE DEPARTMENT OF JUSTICE:**

                                         LORINDA I. LARYEA
                                         Acting Chief, Fraud Section
                                         Criminal Division
                                         United States Department of Justice

23

**AGREED:**

**FOR COMUNICACIONES CELULARES S.A.:**

Date: _____          By: _____
                                Rafael Alvarado Riedel
                                Comunicaciones Celulares S.A.

Date: 11/3/25              By: _____
                                Lanny A. Breuer
                                Daniel Suleiman
                                Veronica Yepez
                                Molly Doggett
                                Covington and Burling LLP
                                Counsel for Comunicaciones Celulares S.A.

**FOR MILLICOM INTERNATIONAL CELLULAR SA:**

Date: _____          By: _____
                                Salvador Escalon
                                Millicom International Cellular SA

Date: 11/3/25              By: _____
                                Lanny A. Breuer
                                Daniel Suleiman
                                Veronica Yepez
                                Molly Doggett
                                Covington and Burling LLP
                                Counsel for Millicom International
                                Cellular SA

**FOR THE DEPARTMENT OF JUSTICE:**

                                LORINDA I. LARYEA
                                Acting Chief, Fraud Section
                                Criminal Division
                                United States Department of Justice

**AGREED:**

**FOR COMUNICACIONES CELULARES S.A.:**

Date: _____          By: _____

Rafael Alvarado Riedel
Comunicaciones Celulares S.A.

Date: _____          By: _____

Lanny A. Breuer
Daniel Suleiman
Veronica Yepez
Molly Doggett
Covington and Burling LLP
Counsel for Comunicaciones Celulares S.A.

**FOR MILLICOM INTERNATIONAL CELLULAR SA:**

Date: 11/3/25          By: _____

Salvador Escalon
Millicom International Cellular SA

Date: _____          By: _____

Lanny A. Breuer
Daniel Suleiman
Veronica Yepez
Molly Doggett
Covington and Burling LLP
Counsel for Millicom International
Cellular SA

**FOR THE DEPARTMENT OF JUSTICE:**

LORINDA I. LARYEA
Acting Chief, Fraud Section
Criminal Division
United States Department of Justice

23

Date: Nov. 10, 2025

By: _____
Natalie R. Kanerva
Trial Attorney
Katherine Raut
Assistant Chief

JASON A. REDING QUIÑONES
United States Attorney
Southern District of Florida

Date: 11/10/25

By: _____
Eli S. Rubin
Assistant United States Attorney

24

## COMPANY OFFICER'S CERTIFICATE
## FOR COMUNICACIONES CELULARES S.A.

I have read this Agreement and carefully reviewed every part of it with outside counsel for COMUNICACIONES CELULARES S.A. (the "Company"). I understand the terms of this Agreement and voluntarily agree, on behalf of the Company, to each of its terms. Before signing this Agreement, I consulted outside counsel for the Company. Counsel fully advised me of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement.

I have carefully reviewed the terms of this Agreement with the Board of Directors of the Company. I have advised and caused outside counsel for the Company to advise the Board of Directors fully of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in this Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf of the Company, in any way to enter into this Agreement. I am also satisfied with outside counsel's representation in this matter. I certify that I am the Vice President of Legal and Compliance for the Company and that I have been duly authorized by the Company to execute this Agreement on behalf of the Company.

Date: 10/30/2025

COMUNICACIONES CELULARES S.A.

By: _____
Rafael Alvarado Riedel
Vice President of Legal and Compliance

### COMPANY OFFICER'S CERTIFICATE
### FOR MILLICOM INTERNATIONAL CELLULAR SA

I have read this Agreement and carefully reviewed every part of it with outside counsel for Millicom International Cellular SA ("Millicom"). I understand the terms of this Agreement and voluntarily agree, on behalf of Millicom, to each of its terms. Before signing this Agreement, I consulted outside counsel for Millicom. Counsel fully advised me of the rights of Millicom, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement.

I have carefully reviewed the terms of this Agreement with the Board of Directors of Millicom. I have advised and caused outside counsel for Millicom to advise the Board of Directors fully of the rights of Millicom, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in this Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf of Millicom, in any way to enter into this Agreement. I am also satisfied with outside counsel's representation in this matter. I certify that I am the Chief Legal and Compliance Officer for Millicom and that I have been duly authorized by Millicom to execute this Agreement on behalf of Millicom.

Date: __11/3/25__

MILLICOM INTERNATIONAL CELLULAR SA

By: _____
Salvador Escalon
Chief Legal and Compliance Officer

## CERTIFICATE OF COUNSEL
## FOR COMUNICACIONES CELULARES S.A.

I am counsel for Comunicaciones Celulares S.A. (the "Company") in the matter covered by this Agreement. In connection with such representation, I have examined relevant Company documents and have discussed the terms of this Agreement with the Company Board of Directors. Based on our review of the foregoing materials and discussions, I am of the opinion that the representative of the Company has been duly authorized to enter into this Agreement on behalf of the Company and that this Agreement has been duly and validly authorized, executed, and delivered on behalf of the Company and is a valid and binding obligation of the Company. Further, I have carefully reviewed the terms of this Agreement with the Board of Directors and the Vice President of Legal and Compliance of the Company. I have fully advised them of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions and of the consequences of entering into this Agreement. To my knowledge, the decision of the Company to enter into this Agreement, based on the authorization of the Board of Directors, is an informed and voluntary one.

Date: 11/3/25

By: _____

Lanny A. Breuer
Daniel Suleiman
Veronica Yepez
Molly Doggett
Covington and Burling LLP
Counsel for Comunicaciones Celulares S.A.

## CERTIFICATE OF COUNSEL
## FOR MILLICOM INTERNATIONAL CELLULAR SA

I am counsel for Millicom International Cellular SA ("Millicom") in the matter covered by this Agreement. In connection with such representation, I have examined relevant Millicom documents and have discussed the terms of this Agreement with the Millicom Board of Directors. Based on our review of the foregoing materials and discussions, I am of the opinion that the representative of Millicom has been duly authorized to enter into this Agreement on behalf of Millicom and that this Agreement has been duly and validly authorized, executed, and delivered on behalf of Millicom and is a valid and binding obligation of Millicom. Further, I have carefully reviewed the terms of this Agreement with the Board of Directors and the Chief Legal and Compliance Officer of Millicom. I have fully advised them of the rights of Millicom, of possible defenses, of the Sentencing Guidelines' provisions and of the consequences of entering into this Agreement. To my knowledge, the decision of Millicom to enter into this Agreement, based on the authorization of the Board of Directors, is an informed and voluntary one.

Date: 11/3/25

By: _____

Lanny A. Breuer
Daniel Suleiman
Veronica Yepez
Molly Doggett
Covington and Burling LLP
Counsel for Millicom International Cellular
SA

## ATTACHMENT A

## STATEMENT OF FACTS

The following Statement of Facts is incorporated by reference as part of the Deferred Prosecution Agreement (the "Agreement") between the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section"), the United States Attorney's Office for the Southern District of Florida (the "Office") (collectively, "the Offices" or the "United States"), and Comunicaciones Celulares S.A., d/b/a TIGO Guatemala (the "Company" or "TIGO Guatemala"). Certain of the facts herein are based on information obtained from third parties by the United States through its investigation and described to TIGO Guatemala. TIGO Guatemala hereby agrees and stipulates that the following information is true and accurate. TIGO Guatemala admits, accepts, and acknowledges that it is responsible for the acts of its officers, directors, employees, and agents as set forth below. Should the United States pursue the prosecution that is deferred by this Agreement, TIGO Guatemala agrees that it will neither contest the admissibility of, nor contradict, this Statement of Facts in any such proceeding. The following facts establish beyond a reasonable doubt the charges set forth in the criminal Information attached to this Agreement:

### Relevant Entities and Individuals

1.      Millicom International Cellular, S.A. ("Millicom") was an international telecommunications company incorporated and headquartered in Luxembourg. As of 2015, its principal place of business was in the Southern District of Florida. Millicom was a "domestic concern" as that term is used in the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Section 78dd-2(h)(1)(B).

2.      Defendant Comunicaciones Celulares S.A., d/b/a TIGO Guatemala, was a mobile and fixed telecommunications service provider with its principal place of business in Guatemala. During the relevant period, TIGO Guatemala was jointly owned by Millicom (55%) and a Panamanian company ("Panama Company" (45%)), the identity of which is known to the United States and TIGO Guatemala. On or about November 12, 2021, Millicom purchased Panama Company's share of TIGO Guatemala for approximately \$2.2 billion. Since then, TIGO Guatemala has been wholly-owned by Millicom. TIGO Guatemala was a "person" as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-3(f)(1).

3.      "Shareholder 1," an individual whose identity is known to the United States and TIGO Guatemala, was a citizen of Guatemala. Shareholder 1 was the owner of Panama Company and exercised substantial control over TIGO Guatemala until his interest was purchased by Millicom. Shareholder 1 was a "director" and "stockholder" of TIGO Guatemala, as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-3(a).

4.      Acisclo Valladares Urruela ("Valladares") was a citizen of Guatemala and TIGO Guatemala's Chief Corporate Affairs Officer and Head of Legal in or around and between 2008 and 2015 and again serving as Chief Corporate Affairs Officer in or around 2017. Valladares was an "officer," "employee," and "agent" of TIGO Guatemala, as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-3(a).

5.      "TIGO Guatemala Executive 1," an individual whose identity is known to the United States and TIGO Guatemala, was a Guatemalan citizen and a high-level TIGO Guatemala executive from in or around 2011 through in or around 2022. TIGO Guatemala Executive 1 reported directly to the TIGO Guatemala Board of Directors. TIGO Guatemala Executive 1 was

A - 2

an "officer," "employee," and "agent" of TIGO Guatemala, as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-3(a).

6.      "Board Member 1," an individual whose identity is known to the United States and TIGO Guatemala, was a United States citizen, an executive of Millicom, and a TIGO Guatemala board member from in or around 2013 through in or around 2015.  Board Member 1 was a "domestic concern" and an "officer," "employee" and "agent" of a domestic concern as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1)(A), and a "director" and "agent" of TIGO Guatemala, as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-3(a).

7.      Alvaro Estuardo Cobar Bustamante ("Cobar") was a Guatemalan citizen and director of a Guatemalan bank.

8.      "Guatemalan Consortium," the identity of which is known to the United States and TIGO Guatemala, was a group of companies formed in Guatemala by Shareholder 1 and controlled by Shareholder 1.

**The Bribery Scheme**

9.      From at least in or around 2012 through in or around June 2018, in the Southern District of Florida and elsewhere, TIGO Guatemala, through its Guatemalan shareholder, officers, employees, and agents, knowingly and willfully conspired and agreed with others to corruptly offer and pay bribes to, and for the benefit of, foreign officials in Guatemala, to influence acts and decisions of such foreign officials in their official capacity and secure improper business advantages for TIGO Guatemala and its co-conspirators.  The bribery scheme was widespread and systematic, involving, among other conduct, monthly cash payments to numerous Guatemalan members of Congress in exchange for, among other things, their support for legislation that

A - 3

benefited TIGO Guatemala.  The bribes were usually paid in cash by and at the direction of Shareholder 1, TIGO Guatemala Executive 1, and Valladares, among others, and typically picked up at the TIGO Guatemala offices by political officials or members of their security teams.  TIGO Guatemala earned profits of at least approximately $58 million from the corrupt scheme.

A.    Benefits obtained by TIGO Guatemala

10.    During the relevant period, TIGO Guatemala maintained approximately 40-50% market share of Guatemala's mobile telecommunications sector.  TIGO Guatemala paid bribes to Guatemalan legislators to ensure their support for legislation and policies favorable to TIGO Guatemala.  For example, the bribery scheme resulted in (1) the passage of legislation in 2012 that permitted TIGO Guatemala to renew its radiofrequency usufruct titles—the right to use, possess, and benefit from the spectrum while the government maintained ownership—for a 20-year term; and (2) the passage of legislation in 2014, frequently referred to as "Ley TIGO" because it disproportionately benefited TIGO Guatemala.

11.    Regarding the first benefit, in or around 2011, members of the Guatemalan congress introduced bills aimed at modifying the spectrum right renewal process.  Some of TIGO Guatemala's spectrum rights were set to expire in the coming years and the legislative proposals threatened TIGO Guatemala's certainty that its spectrum rights would be renewed and if so, for how long.  Therefore, in or around 2012, Shareholder 1 and TIGO Guatemala executives, including TIGO Guatemala Executive 1 and Valladares, decided to institute frequent and regular bribe payments to Guatemalan government officials to influence their legislative decision-making.

12.    In or around November 2012, following corrupt payments overseen by Shareholder 1 to numerous Guatemalan legislators, Guatemala's congress enacted an amendment to the country's telecommunications law, which allowed TIGO Guatemala and others to substitute their

A - 4

radiofrequency usufruct titles for a 20-year term.  Under previously existing law, the duration of usufruct titles and any subsequent renewal terms had been limited to 15 years.

13.     Also as a result of its bribery scheme, on or about April 8, 2014, TIGO Guatemala secured the passage of the Law Regulating Mobile Telecommunications in Detention Centers and Strengthening of the Infrastructure for Data Transmission (colloquially referred to as "Ley TIGO").  The law required telecommunications companies to block reception within a certain distance around detention centers to help create an enhanced security perimeter.  More importantly for TIGO Guatemala, the law permitted companies to obtain all authorizations for the installment of telecommunications infrastructure, including cellular towers, from the national government instead of from the local governments in the municipalities where each project was located.

14.     Two days after the passage of Ley TIGO, TIGO Guatemala signed four contracts with the Guatemalan National Civil Police to establish video camera surveillance systems, connected with fiber optics and cloud storage, in certain municipalities.  However, at the time the contracts were signed, TIGO Guatemala did not have the ability to perform the contracts because TIGO Guatemala lacked the necessary infrastructure.  Because of the new law, TIGO Guatemala was not only able to obtain authorization to build the needed infrastructure, but for the first six months after the law entered into force, it was also the only telecommunications company that satisfied the technical specifications imposed by the law to be permitted to seek authorization through the national government.  TIGO Guatemala enjoyed an unfair commercial advantage over competitors because it was able to rapidly seek authorization to build out significant telecommunications infrastructure without seeking the approval of the municipalities.  The law was declared unconstitutional in or around March 2016 by the Guatemalan Constitutional Court for procedural reasons.

A - 5

B.      Schemes to Generate Cash for Bribes

15.     Throughout the relevant period, TIGO Guatemala, through Shareholder 1, TIGO

Guatemala Executive 1, Valladares, and others, effectuated the bribery scheme by developing and

implementing a variety of different cash generation strategies.  In furtherance of the bribery

scheme, the co-conspirators obtained continuous access to large amounts of clean, untraceable

cash in order to make the bribe payments and to reimburse Valladares and others for bribes they

had advanced to legislators out of their own funds.

*Cash for Bribes from Shareholder 1 Companies Delivered via Helicopter*

16.     At least as early as mid-2012, an employee of the Guatemalan Consortium

delivered cash directly to Valladares to make bribe payments to Guatemalan officials.  The money

was generally transported to the TIGO Guatemala office in duffel bags by helicopter, which

Valladares picked up from the TIGO Guatemala helipad and stored in his TIGO Guatemala office.

Sometimes, Valladares delivered the bags to the offices of government officials or political parties.

On other occasions, government officials or associated security teams came to the TIGO

Guatemala office to retrieve the cash.

17.     In or around 2013, a helicopter carrying cash destined for Valladares had to make

an emergency landing at a military base.  As the cash couriers exited the plane carrying the bags

of cash, the military base commander observed and reported the incident to Guatemalan

authorities, who in turn initiated an investigation.  Shortly thereafter, Shareholder 1 decided to stop

the cash deliveries by helicopter and Shareholder 1, TIGO Guatemala Executive 1, and Valladares

determined that TIGO Guatemala needed a new way to obtain cash for bribe payments.

18.     On or about May 28, 2014, a senior executive of the Guatemalan Consortium sent

Valladares an email accounting for 27 cash deliveries that the Guatemalan Consortium's senior

executive had made to Valladares and TIGO Guatemala Executive 1 to effectuate bribe payments to Guatemalan government officials between June 2012 and May 2014 in the amount of 142,025,000 Quetzales (approximately $18.3 million).

*Cash for Bribes Generated from a Put-Call Agreement with Millicom*

19.     In or around late 2013, Shareholder 1 told Board Member 1 and a Millicom executive that he would use a portion of a $15 million fee that he demanded from Millicom in exchange for a put-call agreement to pay bribes and to fund political campaigns in Guatemala.

20.     On or about January 1, 2014, Millicom and Panama Company executed the put-call agreement, pursuant to which Panama Company granted Millicom an unconditional call option for Panama Company's 45% stake in TIGO Guatemala with a minimum term of two years. In return, Millicom granted Panama Company a put option for the same duration, exercisable in the event Millicom were to sell its interest or undergo a change of control.

21.     As part of the put-call agreement, Millicom agreed to pay Panama Company approximately $15 million as an "execution fee." In fact, however, the execution fee was a mechanism to legitimize a transfer of money from Millicom to Panama Company, in order to repay Shareholder 1 for money he had personally fronted for bribe payments to Guatemalan government officials and to provide him funds to make additional bribe payments.

*Cash Generated via Inflated and Backdated Contracts with Entities Controlled by Shareholder 1*

22.     In or around June 2014, TIGO Guatemala Executive 1 executed a significantly inflated contract on behalf of TIGO Guatemala with an entity associated with Shareholder 1 to generate a $12 million slush fund to pay bribes to Guatemalan government officials.

23. On or about August 8, 2014, Shareholder 1 caused a payment of approximately $600,000 to be wired from a shell company he controlled to a bank account in the United States controlled by Valladares. The purpose of this payment was to reimburse Valladares for bribes he previously paid to Guatemalan government officials with personal funds on behalf of and for the benefit of TIGO Guatemala.

24. Around the same time, in or around August or September 2014, Valladares executed a series of backdated contracts between his Panamanian legal services company and three shell companies controlled by Shareholder 1. The contracts were backdated to May 30, 2013, to align with the time period of legal services previously provided by the Panamanian legal services company to Shareholder 1 so as not to attract suspicion.

25. Using the slush fund generated as a result of the inflated contract, TIGO Guatemala, through Shareholder 1, caused the shell companies to transfer approximately $11 million to Valladares (including to his personal account at a bank in the United States) to provide cash for TIGO Guatemala's bribe payments in Guatemala.

26. For example, on or about September 17, 2014, the Panamanian legal services company submitted an inflated invoice for $2,175,000 to a shell company controlled by Shareholder 1.

27. On or about September 29, 2014, Shareholder 1 caused a payment of approximately $2,175,000 to be wired from the shell company to the Panamanian legal services company account. These funds were derived from the $12 million slush fund.

*Cash for Bribes from Banker who Laundered Money for Narcotraffickers*

28. In or around June 2014, during a meeting between Shareholder 1, TIGO Guatemala Executive 1, and Valladares, TIGO Guatemala Executive 1 declared that TIGO Guatemala needed

A - 8

to change its strategy for generating clean cash to pay bribes and that Valladares should propose a new plan. Accordingly, Shareholder 1 and TIGO Guatemala Executive 1 authorized Valladares to seek advice on this issue from a TIGO Guatemala legal advisor.

29.     On or about August 25, 2014, the TIGO Guatemala legal adviser sent an email to Valladares with the subject "esquema" (*i.e.*, diagram) in which he proposed to Valladares a mechanism by which cash could be generated by inflating invoices for recurring services in order to fund bribe payments to Guatemalan government officials.

30.     In or around August 2014, Valladares needed additional cash to make bribe payments. Valladares met with the president of a Guatemalan bank who was a close friend of Shareholder 1. As a result of that meeting, a bank truck was sent to TIGO Guatemala headquarters, and the requested cash was delivered to Valladares' office in plastic bags. Valladares obtained approximately 10-11 million Quetzales (the equivalent of approximately $1 million) in this manner.

31.     Beginning in approximately August or September 2014, Valladares developed a relationship with a different banker, Cobar, in order to identify a new source of cash to be used for bribes. Together, Valladares and Cobar used falsified or back-dated contracts, shell companies, and fraudulent invoices to legitimize financial transfers that were executed to provide Valladares with cash in order to pay bribes to Guatemalan officials and reimbursements for bribes TIGO Guatemala executives had already paid.

32.     Some of the cash provided to TIGO Guatemala came from drug trafficking and persons who had obtained a significant amount of cash through corruption.

33.     For example, in or around 2016, Cobar laundered approximately $1 million for a narcotics trafficker to assist the narcotics trafficker in purchasing a house in Guatemala. As part

A - 9

of the scheme, Cobar gave the cash from the narcotics trafficker to Valladares to pay bribes to Guatemalan officials on behalf of TIGO Guatemala.

34.     In or around late 2017, Cobar laundered more money for the same drug trafficker. On or about December 28, 2017, Valladares caused the transfer of approximately $350,000 from his U.S. account to a bank account in the Southern District of Florida controlled by Cobar.  The transfer was part of a series of financial transactions to generate cash in Quetzales to pay bribes to Guatemalan officials on behalf of and for the benefit of TIGO Guatemala while, at the same time, assisting a narcotics trafficker transfer money from Guatemala to Colombia and Ecuador.

35.     On or about September 5, 2018, Cobar forwarded a screenshot to Valladares depicting a ledger of cash deliveries Cobar provided to TIGO Guatemala between December 1, 2017, and June 6, 2018.  Cobar also sent Valladares a "key" that was necessary to interpret coded references to the bribe payments in the ledger.

**ATTACHMENT B**

## CERTIFICATE OF CORPORATE RESOLUTIONS
## FOR COMUNICACIONES CELULARES S.A.

WHEREAS, Comunicaciones Celulares S.A. (the "Company") has been engaged in discussions with the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section") and the United States Attorney's Office for the Southern District of Florida ("SDFL") (together, the "Offices") regarding issues arising in relation to certain improper payments to foreign officials to influence acts and decisions of such foreign officials in their official capacity and secure improper business advantages for the Company and its co-conspirators; and

WHEREAS, in order to resolve such discussions, it is proposed that the Company enter into a certain agreement with the Offices; and

WHEREAS, the Company's Vice President of Legal and Compliance, Rafael Alvarado Riedel, together with outside counsel for the Company, have advised the Board of Directors of the Company of its rights, possible defenses, the Sentencing Guidelines' provisions, and the consequences of entering into such agreement with the Offices;

Therefore, the Board of Directors has RESOLVED that:

1.     The Company (a) acknowledges the filing of the one-count Information charging the Company with conspiracy to commit an offense against the United States, in violation of Title 18, United States Code, Section 371, that is, to violate the anti-bribery provisions of the Foreign Corrupt Practices Act of 1977 ("FCPA"), as amended, Title 15, United States Code, Section 78dd-3; (b) waives indictment on such charges and enters into a deferred prosecution agreement with the Offices; (c) agrees to accept a monetary penalty against the Company totaling $60,000,000,

B - 1

and to pay such penalty to the United States Treasury with respect to the conduct described in the Information; and (d) agrees to pay $58,198,343 in forfeiture as instructed by the Offices with respect to the conduct described in the Information;

2.      The Company accepts the terms and conditions of this Agreement, including, but not limited to, (a) a knowing waiver of its rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); and (b) a knowing waiver for purposes of this Agreement and any charges by the United States arising out of the conduct described in the attached Statement of Facts of any objection with respect to venue and consents to the filing of the Information, as provided under the terms of this Agreement, in the United States District Court for the Southern District of Florida; and (c) a knowing waiver of any defenses based on the statute of limitations for any prosecution relating to the conduct described in the attached Statement of Facts or relating to conduct known to the Offices prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement;

3.      The Vice President of Legal and Compliance of the Company, Rafael Alvarado Riedel, is hereby authorized, empowered and directed, on behalf of the Company, to execute the Deferred Prosecution Agreement substantially in such form as reviewed by this Board of Directors at this meeting with such changes as the Vice President of Legal and Compliance of the Company, Rafael Alvarado Riedel, may approve;

4.      The Vice President of Legal and Compliance of the Company, Rafael Alvarado Riedel, is hereby authorized, empowered and directed to take any and all actions as may be necessary or appropriate and to approve the forms, terms or provisions of any agreement or other

B - 2

documents as may be necessary or appropriate, to carry out and effectuate the purpose and intent of the foregoing resolutions; and

     5.    All of the actions of the Vice President of Legal and Compliance of the Company, Rafael Alvarado Riedel, which actions would have been authorized by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved, and adopted as actions on behalf of the Company.

Date: __11/3/25__

By:      _____
           Corporate Secretary
           Comunicaciones Celulares S.A.

## CERTIFICATE OF CORPORATE RESOLUTIONS
## FOR MILLICOM INTERNATIONAL CELLULAR SA

WHEREAS, Millicom International Cellular SA ("Millicom") has been engaged in discussions with the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section") and the United States Attorney's Office for the Southern District of Florida ("SDFL") (together, the "Offices") regarding issues arising in relation to certain improper payments to foreign officials to influence acts and decisions of such foreign officials in their official capacity and secure improper business advantages for Comunicaciones Celulares S.A. (the "Company") and its co-conspirators; and

WHEREAS, in order to resolve such discussions, it is proposed that Millicom (on behalf of itself and its subsidiaries and affiliates) agrees to certain terms and obligations of a deferred prosecution agreement between the Company and the Offices; and

WHEREAS, Millicom's Chief Legal and Compliance Officer, Salvador Escalon, together with outside counsel for Millicom, have advised the Board of Directors of Millicom of its rights, possible defenses, the Sentencing Guidelines' provisions, and the consequences of agreeing to such terms and obligations of the Agreement between the Company and the Offices;

Therefore, the Board of Directors has RESOLVED that:

1.      Millicom (a) acknowledges the filing of the one-count Information charging the Company with conspiracy to commit an offense against the United States, in violation of Title 18, United States Code, Section 371, that is, to violate the anti-bribery provisions of the Foreign Corrupt Practices Act of 1977 ("FCPA"), as amended, Title 15, United States Code, Section 78dd-3; (b) undertakes certain obligations under the Agreement between the Company and the Offices; (c) agrees to accept a monetary penalty against the Company totaling $60,000,000, and to pay such

B - 4

penalty to the United States Treasury with respect to the conduct described in the Information if the Company does not pay such monetary penalty within the time period specified in the Agreement; and (d) agrees that the Company must pay $58,198,343 in forfeiture with respect to the conduct described in the Information and agrees to pay such forfeiture as instructed by the Offices if the Company does not pay such forfeiture within the time period specified by the Agreement;

2.      Millicom accepts the terms and conditions of this Agreement, including, but not limited to, (a) a knowing waiver of the Company's rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); and (b) a knowing waiver for purposes of this Agreement and any charges by the United States arising out of the conduct described in the attached Statement of Facts of any objection with respect to venue and consents to the filing of the Information against the Company, as provided under the terms of this Agreement, in the United States District Court for the Southern District of Florida; and (c) a knowing waiver of any defenses based on the statute of limitations for any prosecution relating to the conduct described in the attached Statement of Facts or relating to conduct known to the Offices prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement;

3.      The Chief Legal and Compliance Officer of Millicom, Salvador Escalon, is hereby authorized, empowered and directed, on behalf of Millicom, to agree to certain terms and obligations of the Agreement substantially in such form as reviewed by this Board of Directors at this meeting with such changes as the Chief Legal and Compliance Officer of Company, Salvador Escalon, may approve;

4.      The Chief Legal and Compliance Officer of Millicom, Salvador Escalon, is hereby authorized, empowered and directed to take any and all actions as may be necessary or appropriate and to approve the forms, terms or provisions of any agreement or other documents as may be necessary or appropriate, to carry out and effectuate the purpose and intent of the foregoing resolutions; and

5.      All of the actions of the Chief Legal and Compliance Officer of Millicom, Salvador Escalon, which actions would have been authorized by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved, and adopted as actions on behalf of Millicom.

Date: October 30, 2025

By: _____

Corporate Secretary
Millicom International Cellular SA

B - 6

**ATTACHMENT C**

**CORPORATE COMPLIANCE PROGRAM**

In order to address any deficiencies in the Company's internal controls, compliance code, policies, and procedures regarding compliance with the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. §§ 78dd-1, *et seq.,* and other applicable anti-corruption laws (collectively, the "anti-corruption laws"), Comunicaciones Celulares S.A. and its parent company, Millicom International Cellular SA (the "Companies") agree to continue to conduct, in a manner consistent with all of their obligations under this Agreement, appropriate reviews of the Company's existing internal controls, policies, and procedures.

Where necessary and appropriate, the Companies agree to modify their compliance programs, including internal controls, compliance policies, and procedures in order to ensure that they maintain: (a) an effective system of internal accounting controls designed to ensure the making and keeping of fair and accurate books, records, and accounts; and (b) a rigorous anti-corruption compliance program that incorporates relevant internal accounting controls, as well as policies and procedures designed to effectively detect and deter violations of the FCPA and other applicable anti-corruption laws. At a minimum, this should include, but not be limited to, the following elements to the extent they are not already part of the Companies' existing internal controls, compliance code, policies, and procedures:

*Commitment to Compliance*

1.      The Companies will ensure that their directors and senior management provide strong, explicit, and visible support and commitment to compliance with their corporate policy against violations of the anti-corruption laws, compliance policies, and Code of Conduct, and demonstrate rigorous support for compliance principles via their actions and words.

C - 1

2.      The Companies will ensure that mid-level management throughout their organization reinforce leadership's commitment to compliance policies and principles and encourage employees to abide by them.  The Companies will create and foster a culture of ethics and compliance with the law in their day-to-day operations at all levels of the Companies.

*Periodic Risk Assessment and Review*

3.      The Companies will implement a risk management process to identify, analyze, and address the individual circumstances of the Companies, and in particular foreign bribery risks facing the Companies.

4.      On the basis of their periodic risk assessment, the Companies shall take appropriate steps to design, implement, or modify each element of their compliance programs to reduce the risk of violations of the anti-corruption laws, their compliance policies, and their Code of Conduct.

*Policies and Procedures*

5.      The Companies will develop and promulgate a clearly articulated and visible corporate policy against violations of the FCPA and other applicable anti-corruption laws (collectively, the "anti-corruption laws"), which shall be memorialized in a written compliance policy or policies.

6.      The Companies will develop and promulgate compliance policies and procedures designed to reduce the prospect of violations of the anti-corruption laws and the Companies' compliance policies and Code of Conduct, and the Companies will take appropriate measures to encourage and support the observance of ethics and compliance policies and procedures against violation of the anti-corruption laws by personnel at all levels of the Companies.  These anti-corruption policies and procedures shall apply to all directors, officers, and employees and, where necessary and appropriate, outside parties acting on behalf of the Companies in a foreign

C - 2

jurisdiction, including all agents and business partners. The Companies shall notify all employees that compliance with the policies and procedures is the duty of individuals at all levels of the Companies. Such policies and procedures shall address:

      a.     gifts;

      b.     hospitality, entertainment, and expenses;

      c.     customer travel;

      d.     political contributions;

      e.     charitable donations and sponsorships;

      f.     facilitation payments; and

      g.     solicitation and extortion.

7.     The Companies will ensure that they have a system of financial and accounting procedures, including a system of internal controls, reasonably designed to ensure the maintenance of fair and accurate books, records, and accounts. This system should be designed to provide reasonable assurances that:

      a.     transactions are executed in accordance with management's general or specific authorization;

      b.     transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for assets;

      c.     access to assets is permitted only in accordance with management's general or specific authorization; and

      d.     the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

8.    The Companies shall review their anti-corruption compliance policies and procedures as necessary to address changing and emerging risks and update them as appropriate to ensure their continued effectiveness, taking into account relevant developments in the field and evolving international and industry standards.

*Independent, Autonomous, and Empowered Oversight*

10.    The Companies will assign responsibility to one or more senior corporate executives of the Companies for the implementation and oversight of the Companies' anti-corruption compliance policies and procedures.  Such corporate official(s) shall have the authority to report directly to independent monitoring bodies, including internal audit, the Companies' Board of Directors, or any appropriate committee of the Companies' Board of Directors, and shall have an adequate level of autonomy from management as well as sufficient resources, authority, and support from senior leadership to maintain such autonomy.

*Training and Guidance*

11.    The Companies will implement mechanisms designed to ensure that their Code of Conduct and anti-corruption compliance policies and procedures are effectively communicated to all directors, officers, employees, and, where necessary and appropriate, agents and business partners.  These mechanisms shall include: (a) periodic training for all directors and officers, all employees in positions of leadership or trust, positions that require such training (e.g., internal audit, sales, legal, compliance, finance), or positions that otherwise pose a corruption risk to the Companies, and, where necessary and appropriate, agents and business partners; and (b) metrics for measuring knowledge retention and effectiveness of the training.  The Companies will conduct training in a manner tailored to the audience's size, sophistication, or subject matter expertise and, where appropriate, will discuss prior compliance incidents.

C - 4

12.     The Companies will maintain, or where necessary establish, an effective system for providing guidance and advice to directors, officers, employees, and, where necessary and appropriate, agents and business partners, on complying with the Companies' anti-corruption compliance policies and procedures, including when they need advice on an urgent basis or in any foreign jurisdiction in which the Companies operate.

*Confidential Reporting Structure and Investigation of Misconduct*

13.     The Companies will maintain, or where necessary establish, an effective system for internal and, where possible, confidential reporting by, and protection of, directors, officers, employees, and, where appropriate, agents and business partners concerning violations of the anti-corruption laws or the Companies' Code of Conduct or anti-corruption compliance policies and procedures and protection of directors, officers, employees, and where appropriate, agents, and business partners who make such reports.

14.     The Companies will maintain, or where necessary establish, an effective and reliable process with sufficient resources for responding to, investigating, and documenting allegations of violations of the anti-corruption laws or the Companies' anti-corruption compliance policies and procedures.

*Compensation Structures and Consequence Management*

15.     The Companies will implement clear mechanisms to incentivize behavior amongst all directors, officers, employees, and, where necessary and appropriate, parties acting on behalf of the Companies that comply with their corporate policy against violations of the anti-corruption laws, its compliance policies, and its Code of Conduct. These incentives shall include, but shall

not be limited to, the implementation of criteria related to compliance in the Companies' compensation and bonus system subject to local labor laws.

16.    The Companies will institute appropriate disciplinary procedures to address, among other things, violations of the anti-corruption laws and the Companies' Code of Conduct and anti-corruption compliance policies and procedures by the Companies' directors, officers, and employees.  Such procedures should be applied consistently and fairly, regardless of the position held by, or perceived importance of, the director, officer, or employee.  The Companies shall implement procedures to ensure that where misconduct is discovered, reasonable steps are taken to remedy the harm resulting from such misconduct, and to ensure that appropriate steps are taken to prevent further similar misconduct, including assessing the internal controls, Code of Conduct, and compliance policies and procedures and making modifications necessary to ensure the overall anti-corruption compliance program is effective.

*Third-Party Management*

17.    The Companies will institute appropriate risk-based due diligence and compliance requirements pertaining to the retention and oversight of all agents and business partners, including:

a.    properly documented due diligence pertaining to the hiring and appropriate and regular oversight of agents and business partners;

b.    informing agents and business partners of the Companies' commitment to abiding by anti-corruption laws, and of the Companies' Code of Conduct and anti-corruption compliance policies and procedures; and

c.    seeking a reciprocal commitment from agents and business partners.

C - 6

18.    The Companies will understand and record the business rationale for using a third party in a transaction, and will conduct adequate due diligence with respect to the risks posed by a third-party partner such as a third-party partner's reputations and relationships, if any, with foreign officials. The Companies will ensure that contract terms with third parties specifically describe the services to be performed, that the third party is actually performing the described work, and that its compensation is commensurate with the work being provided in that industry and geographical region. The Companies will engage in ongoing monitoring and risk management of third-party relationships through updated due diligence, training, audits, and/or annual compliance certifications by the third party.

19.    Where necessary and appropriate, the Companies will include standard provisions in agreements, contracts, and renewals thereof with all agents and business partners that are reasonably calculated to prevent violations of the anti-corruption laws, which may, depending upon the circumstances, include:  (a) anti-corruption representations and undertakings relating to compliance with the anti-corruption laws; (b) rights to conduct audits of the books and records of the agent or business partner to ensure compliance with the foregoing; and (c) rights to terminate an agent or business partner as a result of any breach of the anti-corruption laws, the Companies' Code of Conduct or compliance policies, or procedures, or the representations and undertakings related to such matters.

*Mergers and Acquisitions*

20.    The Companies will develop and implement policies and procedures for mergers and acquisitions requiring that the Companies conduct appropriate risk-based due diligence on potential new business entities, including appropriate FCPA and anti-corruption due diligence by legal, accounting, and compliance personnel.

21.     The Companies will ensure that the Companies' Code of Conduct and compliance policies and procedures regarding the anti-corruption laws apply as quickly as is practicable to newly acquired businesses or entities merged with the Companies and will promptly:

a.      train the directors, officers, employees, agents, and business partners consistent with Paragraph 11 above on the anti-corruption laws and the Companies' compliance policies and procedures regarding anti-corruption laws;

b.      where warranted, conduct an FCPA-specific audit of all newly acquired or merged businesses as quickly as practicable;

c.      where warranted, establish a plan to integrate the acquired businesses or entities into the Companies' enterprise resource planning systems as quickly as practicable.

*Monitoring and Testing*

22.     The Companies will conduct periodic reviews and testing of all elements of their compliance programs to evaluate and improve their effectiveness in preventing and detecting violations of anti-corruption laws and the Companies' Code of Conduct and anti-corruption compliance policies and procedures, taking into account relevant developments in the field and evolving international and industry standards.

23.     The Companies will ensure that compliance and control personnel have sufficient direct or indirect access to relevant sources of data to allow for timely and effective monitoring and/or testing of transactions.

*Analysis and Remediation of Misconduct*

24.     The Companies will conduct a root cause analysis of misconduct, including prior misconduct, to identify any systemic issues and/or any control failures.  The Companies will timely and appropriately remediate the root causes of misconduct.  The Companies will ensure that root causes, including systemic issues and controls failures, and relevant remediation are shared with management as appropriate.

## ATTACHMENT D

## COMPLIANCE REPORTING REQUIREMENTS

Comunicaciones Celulares S.A. and its parent company, Millicom International Cellular SA (the "Companies") agree that they will report to the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section") and the United States Attorney's Office for the Southern District of Florida ("SDFL") (collectively, the "Offices") periodically. During the Term, the Companies shall review, test, and update their compliance program and internal controls, policies, and procedures described in Attachment C. The Companies shall be required to: (i) conduct an initial ("first") review and submit a first report and (ii) conduct and prepare a second review and a final report, as described below. Prior to conducting each review, the Companies shall be required to prepare and submit a workplan for the review.

In conducting the reviews, the Companies shall undertake the following activities, among others: (a) inspection of relevant documents, including the Companies' current policies, procedures, and training materials concerning compliance with the FCPA and other applicable anti-corruption laws; (b) inspection and testing of the Companies' systems procedures, and internal controls, including record-keeping and internal audit procedures at sample sites; (c) meetings with, and interviews of, relevant current and, where appropriate, former directors, officers, employees, business partners, agents, and other persons; and (d) analyses, studies, and comprehensive testing of the Companies' compliance program.

### *Written Work Plans, Reviews and Reports*

a.       The Companies shall conduct a first review and prepare a first report, followed by a follow-up review and final report.

D - 1

b.  Within sixty (60) calendar days of the date this Agreement is executed, the Companies shall, after consultation with the Offices, prepare and submit a written work plan to address the Companies' first review.  The Offices shall have thirty (30) calendar days after receipt of the written work plan to provide comments.  If the Offices do not approve the initial work plan, the Company shall have fourteen (14) days to provide a revised work plan to the Offices for review and approval.

c.  With respect to the follow-up review and final report, after consultation with the Offices, the Companies shall prepare a written work plan within forty-five (45) calendar days of the submission of the first report, and the Offices shall provide comments within thirty (30) calendar days after receipt of the written work plan.

d.  All written work plans shall identify with reasonable specificity the activities the Companies plan to undertake to review and test each element of their compliance program, as described in Attachment C.

e.  Any disputes between the Companies and the Offices with respect to any written work plan shall be decided by the Offices in their sole discretion.

f.  No later than one year from the date this Agreement is executed, the Companies shall submit to the Offices a written report setting forth: (1) a complete description of their remediation efforts to date; (2) a complete description of the testing conducted to evaluate the effectiveness of the compliance program and the results of that testing; and (3) their proposals to ensure that its compliance program is reasonably designed, implemented, and enforced so that the program is effective in deterring and detecting violations of the FCPA and other applicable anti-corruption laws.  The report shall be transmitted to:

Deputy Chief – FCPA Unit
Acting Chief - CEC Unit
Criminal Division, Fraud Section
U.S. Department of Justice
1400 New York Avenue, NW
Bond Building, Eleventh Floor
Washington, DC 20005

Chief, Economic Crimes and Cyber Fraud
U.S. Attorney's Office
Southern District of Florida
99 N.E. 4th Street
Miami, Florida 33132

The Companies may extend the time period for issuance of the first report with prior written approval of the Offices.

### *Follow-up Review and Final Report*

g.    The Companies shall undertake a follow-up review and final report, incorporating the views of the Offices on the Companies' prior review and report, to further monitor and assess whether the Companies' compliance program is reasonably designed, implemented, and enforced so that it is effective at deterring and detecting violations of the FCPA and other applicable anti-corruption laws.

h.    The final report shall include a sustainability plan for ongoing improvement, testing, and review of the compliance program to ensure future viability of the program. The final report shall be completed and delivered to the Offices no later than thirty (30) days before the end of the Term.

i.    The Companies may extend the time period for submission of any of the follow-up reports with prior written approval of the Offices.

D - 3

***Confidentiality of Submissions***

g.      Submissions by the Companies, including the work plans and reports, will likely include proprietary, financial, confidential, and competitive business information. Moreover, public disclosure of the submissions could discourage cooperation, impede pending or potential government investigations and thus undermine the objectives of the reporting requirement. For these reasons, among others, the submissions and the contents thereof are intended to remain and shall remain non-public, except as otherwise agreed to by the parties in writing, or except to the extent the Offices determine in their sole discretion that disclosure would be in furtherance of the Offices' discharge of their duties and responsibilities or is otherwise required by law.

**ATTACHMENT E**

**CERTIFICATION**

To:    United States Department of Justice
       Criminal Division, Fraud Section
       Attention: Chief of the Fraud Section

       U.S. Attorney's Office
       Southern District of Florida
       99 N.E. 4th Street
       Miami, Florida 33132
       Attention: Chief, Economic Crimes and Cyber Fraud

Re:    Deferred Prosecution Agreement Disclosure Certification

The undersigned certify, pursuant to Paragraph 22 of the Deferred Prosecution Agreement

("the Agreement") filed on _____ in the United States District Court for the Southern

District of Florida, by and between the United States of America, Comunicaciones Celulares S.A.

(the "Company"), and Millicom International Cellular SA ("Millicom") (the "Companies"), that

undersigned are aware of the Companies' disclosure obligations under Paragraph 6 of the

Agreement, and that the Companies have disclosed to the United States Department of Justice,

Criminal Division, Fraud Section (the "Fraud Section") and the United States Attorney's Office

for the Southern District of Florida ("SDFL") (collectively, the "Offices") any and all evidence or

allegations of conduct required pursuant to Paragraph 6 of the Agreement, which includes evidence

or allegations of any violation of the anti-bribery or accounting provisions of the Foreign Corrupt

Practices Act ("FCPA") or the Foreign Extortion Prevention Act ("FEPA") had the conduct

occurred within the jurisdiction of the United States committed by the Companies' employees or

agents ("Disclosable Information"). This obligation to disclose information extends to any and all

Disclosable Information that has been identified through the Companies' compliance and controls

E - 1

program, whistleblower channel, internal audit reports, due diligence procedures, investigation process, or other processes. The undersigned further acknowledge and agree that the reporting requirements contained in Paragraph 6 and the representations contained in this certification constitute a significant and important component of the Agreement and of the Offices' determination whether the Companies have satisfied their obligations under the Agreement.

The undersigned hereby certify that they are respectively the Chief Executive Officer ("CEO") and the Chief Financial Officer ("CFO") of the Company, and the CEO and the CFO of Millicom and that each has been duly authorized by the Companies to sign this Certification on behalf of the Companies.

This Certification shall constitute a material statement and representation by the undersigned and by, on behalf of, and for the benefit of, the Companies to the executive branch of the United States for purposes of 18 U.S.C. § 1001, and such material statement and representation shall be deemed to have been made in the Southern District of Florida. This Certification shall also constitute a record, document, or tangible object in connection with a matter within the jurisdiction of a department and agency of the United States for purposes of 18 U.S.C. § 1519, and such record, document, or tangible object shall be deemed to have been made in the Southern District of Florida.

Date: _____     Name (Printed): _____

                                Name (Signed): _____
                                Chief Executive Officer
                                Comunicaciones Celulares S.A.

E - 2

Date: _____

Name (Printed): _____

Name (Signed): _____
Chief Financial Officer
Comunicaciones Celulares S.A.


Date: _____

Name (Printed): _____

Name (Signed): _____
Chief Executive Officer
Millicom International Cellular SA


Date: _____

Name (Printed): _____

Name (Signed): _____
Chief Financial Officer
Millicom International Cellular SA

**ATTACHMENT F**

**COMPLIANCE CERTIFICATION**

To:     United States Department of Justice
        Criminal Division, Fraud Section
        Attention: Chief of the Fraud Section

        U.S. Attorney's Office
        Southern District of Florida
        99 N.E. 4th Street
        Miami, Florida 33132
        Attention: Chief, Economic Crimes and Cyber Fraud

Re:     Deferred Prosecution Agreement Compliance Certification

The undersigned certify, pursuant to Paragraph 13 of the Deferred Prosecution Agreement

filed on _____, in the United States District Court for the Southern District of Florida, by

and between the United States of America, Comunicaciones Celulares S.A. (the "Company"),

and Millicom International Cellular SA ("Millicom") (the "Companies") (the "Agreement"), that

the undersigned are aware of the compliance obligations of the Companies under Paragraphs 13

and 14 of the Agreement, and that, based on a review of the Companies' reports submitted to the

Department of Justice, Criminal Division, Fraud Section and the United States Attorney's Office

for the Southern District of Florida ("SDFL") (collectively, the "Offices") pursuant to Paragraph

15 of the Agreement, the reports are true, accurate, and complete.

In addition, the undersigned certify that, based on the undersigned's review and

understanding of the Company's anti-corruption compliance program, the Companies have

implemented at the Company an anti-corruption compliance program that meets the requirements

set forth in Attachment C to the Agreement.  The undersigned certify that such compliance

F - 1

program is reasonably designed to detect and prevent violations of the anti-corruption laws throughout the Company's operations.

The undersigned hereby certify that they are respectively the Chief Executive Officer ("CEO") and the Chief Compliance Officer ("CCO") of the Company, and the CEO and the CCO of Millicom and that each has been duly authorized the Companies to sign this Certification on behalf of the Companies.

This Certification shall constitute a material statement and representation by the undersigned and by, on behalf of, and for the benefit of, the Company and Millicom to the executive branch of the United States for purposes of 18 U.S.C. § 1001, and such material statement and representation shall be deemed to have been made in the Southern District of Florida.  This Certification shall also constitute a record, document, or tangible object in connection with a matter within the jurisdiction of a department and agency of the United States for purposes of 18 U.S.C. § 1519, and such record, document, or tangible object shall be deemed to have been made in the Southern District of Florida.


Date: _____          Name (Printed): _____


                                         Name (Signed): _____
                                         Chief Executive Officer
                                         Comunicaciones Celulares S.A.


Date: _____          Name (Printed): _____


                                         Name (Signed): _____
                                         Chief Compliance Officer
                                         Comunicaciones Celulares S.A.

F - 2

Date: _____        Name (Printed): _____

                                     Name (Signed): _____
                                     Chief Executive Officer
                                     Millicom International Cellular SA

Date: _____        Name (Printed): _____

                                     Name (Signed): _____
                                     Chief Compliance Officer
                                     Millicom International Cellular SA